# THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PERRY GARDNER STOTT, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER DENYING [23] MOTION TO SUPPRESS EVIDENCE** <br><br> Case No. 2:20-cr-00280-DBB <br><br> District Judge David Barlow |

Before the court is Defendant's motion to suppress evidence.[1] Defendant seeks to suppress the evidence stemming from an April 25, 2020 traffic stop and detention as he contends it was unlawful at its inception.[2] On March 10, 2021, the court held an evidentiary hearing on the motion.[3] The court received documentary evidence and heard witness testimony from Officer Wyatt Sackett, Officer Dale Nicholas, Officer Aaron Hargrove, and Mr. Perry Gardner Stott.[4] Having considered the motion, the evidence, the briefing of the parties, and relevant law, the court now determines as follows.

## FINDINGS OF FACT

As of April 2020, the Salt Lake City Police Department (SLCPD) considered the area around the K&K African Market at 996 South Redwood Road to be a high crime area.[5] The

---

[1] Defendant's Motion to Suppress Evidence, ECF No. 23; Defendant's Memorandum in Support of Defendant's Motion to Suppress Evidence, ECF No. 33; United States' Opposition to Motion to Suppress, ECF No. 34.

[2] *See generally* ECF No. 33.

[3] *See* Minute Entry for Evidentiary Hearing, ECF No. 28; Exhibit and Witness List, ECF No. 30; Official Transcript of March 10, 2021 Evidentiary Hearing, ECF No. 32.

[4] *Id.*

[5] Tr. 11:1–17.

market is located on the west side of Redwood Road with a parking lot to the north.[6] SLCPD's west side bike squad had surveilled and monitored vehicle activity at the K&K African Market, with officers positioning themselves in marked vehicles along Redwood Road, observing activity through binoculars from approximately a block to a block and a half away.[7]

When conducting surveillance in the area, if a unit was available, the officers followed every car that left K&K African Market.[8] Officer Wyatt Sackett testified that not all followed vehicles were stopped, but that the officers did stop vehicles if they observed a traffic or equipment violation.[9] He estimated that he had stopped approximately 100 vehicles leaving the market, or roughly half of the vehicles he had followed.[10] Officer Dale Nicholas testified that he also had performed approximately 100 traffic stops on vehicles leaving the market.[11] Nicholas estimated that he stopped about 30 to 40 percent of all vehicles he followed when conducting surveillance.[12] Of the surveillance of the K&K African Market (and finding a gun in this case), Officer Aaron Hargrove stated, "Well, it was just a matter of time. We stopped every car that freakin' leaves there, eventually we're gonna get one."[13] Hargrove testified that his statement about stopping every car was "a sarcastic comment referring to the vehicles that we had stopped leaving the [K&K African Market]."[14] Hargrove clarified that of all the vehicles he followed out

---

[6] Tr. 11:24–25; 10:2–9; 12:15–23; 13:3–5, 11–15; Gov't Ex. 2; Gov't Ex. 3.
[7] Tr. 14:17–25; 15:1–3.
[8] Tr. 15:15–21; 86:20–22; 104:13–17.
[9] Tr. 15:18–16:10; 46:7–10.
[10] Tr. 46:15–17; 42:2–9.
[11] Tr. 85:16–86:12.
[12] Tr. 85:16–86:12.
[13] Gov't Ex. 12, PGS_00008 (Hargrove Camera 2) at 0:00:53.
[14] Tr. 104:5–8.

of the market, he did not observe a violation about fifty percent of the time and did not stop those vehicles.[15]

On April 25, 2020, Sackett was monitoring the K&K African Market with binoculars from his position to the south, approximately one block away.[16] He observed a white vehicle leave the market and turn left onto Redwood Road heading north, and Sackett began following it.[17] The vehicle was in lane one, the travel lane closest to Redwood Road's middle median.[18] As Sackett approached the vehicle, which he identified as a Ford Expedition, he ran a records check of the license plate.[19] The records check confirmed the vehicle was registered to Perry Gardner Stott.[20] Sackett's records check on Stott showed a valid driver license and that Stott was on parole.[21]

Sackett continued following the Expedition in lane one on Redwood Road, over the Interstate 80 overpass toward the South Temple intersection.[22] As the Expedition approached the intersection, it merged to the right from lane one to lane two.[23] As the vehicle started to merge it engaged the turn signal, without first signaling for two seconds.[24] After observing this traffic

---

[15] Tr. 106:11–21.

[16] Tr. 15:6–14, 19:6–13; Gov't Ex. 1.

[17] Tr. 19:14–18, 21:5–9.

[18] Tr. 19:25, 20:1, 21:10–12, 16–17.

[19] Tr. 19:19–24, 21:18–22, 22:8–12.

[20] Tr. 22:4–7, 59:7–17.

[21] Tr. 22:19–25, 23:1–3. At this point, Sackett did not know that Stott was driving the vehicle. Tr. 59:21–25, 60:1–5, 60:17–22.

[22] Tr. 23:4–12.

[23] Tr. 23:13–21, 24:16–25; Gov't Ex. 5.

[24] Tr. 23:14–18, 24:16–25.

3

violation, Sackett activated the patrol vehicle's overhead emergency lights, double-tapped his body-worn camera to begin recording, and radioed in the traffic stop.[25]

The Expedition continued northbound a short distance, turned right onto North Temple, and then turned right into a hotel parking lot where it stopped.[26] Sackett continued following and parked his patrol vehicle behind the Expedition.[27] Around this time, Nicholas showed up to assist in the traffic stop.[28] Sackett and Nicholas got out of their patrol vehicles and approached the Expedition, Sackett headed toward the driver's side and Nicholas to the passenger's side.[29] As he approached the Expedition, Sackett commented, "yeah, hey, watch that passenger, he's looking back."[30] Sackett asked to see the driver's hands and then asked for the driver's license, registration, and proof of insurance.[31] At this point, Sackett and the driver had the following exchange:

> Sackett: So the reason I stopped you is when you merged into the number two lane, you didn't signal two seconds prior to your lane change, okay, you started to merge and then signal.
>
> Defendant: Man you guys were all the way down the block I seen where you guys were at . . .
>
> Sackett: Dude, I was right behind you . . .

---

[25] Tr. 25:4–8, 37:11–25, 38:1–5; Ex. 9. Sackett's body-worn camera captured approximately 30 seconds of video footage, without audio, prior to being activated. Tr. 25:9–18; *see* Gov. Ex. 12, PGS_00005 (Sackett Camera 1). Sackett's body-worn camera was located on his chest and he testified that he preferred it in that position as it was more secure than on his shoulder. Tr. 33:18–23, 34:1–12. Because of its orientation, the video shows the patrol vehicle's dashboard and some passing traffic signage but not the traffic violation. *See* Sackett Camera 1; Gov. Ex. 8.

[26] Tr. 26:1–20, 27:9–25; Gov't Ex. 6. At timestamp 0:00:25 of his body-worn camera, Sackett crosses South Temple just before activating his lights and his body worn camera. *See* Sackett Camera 1. Sackett makes the right turn onto North Temple at 0:00:40, turns into the parking lot at 0:00:48, and stops his patrol vehicle at 0:01:12. *Id.*

[27] Sackett Camera 1 at 0:01:20.

[28] Tr. 28:21–23.

[29] Sackett Camera 1 at 0:01:20; Gov't Ex. 12, PGS_00006 (Nicholas Camera) at 0:00:38.

[30] Sackett Camera 1 at 0:01:20.

[31] *Id.* at 0:01:28.

>    Defendant: No you weren't . . .
>
>    Sackett: Okay, I was . . .
>
>    Defendant: I seen where you guys were parked at.[32]

Stott testified that he thought Sackett was referring to observing a violation when Stott pulled out of the K&K African Market and merged into lane number one from the median.[33] He stated that he turned out of the market, merged into the middle lane using his blinker, and then merged into the northbound number one lane using his blinker.[34] He then continued driving in the number one lane until Sackett activated his emergency lights at South Temple, at which point Stott used his blinker and merged to the right, turned onto North Temple, and pulled into the hotel parking lot.[35]

When Nicholas arrived at the Expedition's front passenger door, the window was up.[36] A few minutes into the stop, the window had been rolled down and Stott told Nicholas, "Yeah man I didn't think like I didn't think I did anything wrong when I merged, you know, 'cause when I pulled out I was just trying to get over, but I apologize."[37] Again, Stott testified that he thought the basis for the stop was a violation occurring when he turned out of the market.[38] Nicholas

---

[32] *Id.* at 0:01:45–0:01:57. Stott testified that he tried to explain to Sackett that he believed he had made a legal lane change, but that Sackett did not give him a chance. Tr. 132:24–133:4. However, when asked whether Sackett did anything to prevent him from explaining his perspective, Stott stated, "I guess not. . . . I could have said something." Tr. 133:10–19. Sackett's camera shows that Stott was informed of the traffic violation at timestamp 0:01:50 and Sackett returned to his patrol vehicle at 0:02:50. Sackett Camera 1. Although Sackett was asking questions of the passenger during some of this time, there is no indication that Stott was prevented in any way from explaining to Sackett that he did not commit a traffic violation. *See id.* Stott also testified that even if he had had a chance to explain, in his opinion "it wouldn't do any good." Tr. 135:12–22.

[33] Tr. 114:13–116:3; *see* Tr. 123:12–124:6.

[34] Tr. 114:23–115:5, 115:9–19.

[35] Tr. 117:10–118:22, 120:5–121:10.

[36] Nicholas Camera at 0:00:45.

[37] *Id.* at 0:03:57–0:04:08.

[38] Tr. 123:12–124:6.

testified this was not his traffic stop, that he did not see the traffic violation, and that he did not know what Stott was referring to, though it seemed as though he was talking about the basis for the stop.[39]

Sackett confirmed that Stott was the driver of the Expedition, and that Stott was on parole.[40] During the stop, Sackett and Nicholas questioned, detained, and searched Stott's passenger.[41] Because the passenger had a parole violation warrant, Sackett determined that he was going to take the passenger to jail.[42] The passenger asked Sackett if he was going to let him go and Sackett responded, "I can't let you go."[43] A short time later Nicholas and Sackett had the following exchange:

> Nicholas: You gonna let him go?
>
> Sackett: No, negative, I don't let parole fugitives go.
>
> Nicholas: Why not?
>
> Sackett: Because they are the most dangerous cop killers.[44]

When asked if the real reason he wouldn't let the passenger go was "because in [his] mind parole fugitives are cop killers," Sackett testified, "Not cop killers, no."[45]

Sacket and the passenger later engaged in the following exchange:

> Sackett: I mean well obviously you're going to jail because you have a warrant, you know what I mean? Um, I've got to talk to you about some things that were found in the car, okay?

---

[39] Tr. 89:16–90:6.

[40] Sackett Camera 1 at 0:02:36.

[41] *Id.* at 0:01:45–0:07:57.

[42] *See* Tr. 62:1–65:12.

[43] Gov't Ex. 12, PGS_00030 (Sackett Camera 2) at 0:00:14–0:00:22.

[44] Sackett Camera 2 at 0:00:35–0:00:40.

[45] Tr. 64:10–19.

6

> Passenger: Okay [inaudible] can you help me out and not go to jail, with regard to that?
>
> Sackett: So because you're a parole fugitive you I have no choice, if I didn't take you to jail I'd be so fucked, you know what I mean?[46]

A short time later, Sacket again stated:

> Sackett: Dude, I feel ya, I would just, I cannot let you go on a parole violation warrant.
>
> Passenger: [inaudible].
>
> Sackett: I know but I cannot like me, myself? I am not comfortable doing that, you know what I mean? If it were any other warrant, I would say yeah, no problem, but a parole fugitive warrant, man? If I let you go, you'd be so screwed, I'd be so screwed.[47]

When asked whether he in fact had a choice to release the passenger, Sackett testified: "Not in my mind, no."[48] Nicholas testified that, of stops he has made out of the K&K African Market, he has never released an individual that has an outstanding parole fugitive warrant.[49] He asserted that it is the general practice of SLCPD to arrest them.[50]

Because of Stott's parole status, Sackett searched the Expedition.[51] During the search, Sackett found a handgun "shoved in between the driver's seat and the center console."[52]

Shortly following the discovery of the gun, Sackett told other officers on the scene, "The west side curse is broken boys," and held up the handgun and magazine he had placed on the hood of his vehicle.[53] As the search of the Expedition continued, Nicholas told Sackett, "Finally

---

[46] Sackett Camera 2 at 0:04:01–0:04:24.

[47] *Id.* at 0:10:20–0:10:40.

[48] Tr. 64:5–9.

[49] Tr. 99:24–100:2.

[50] Tr. 100:3–8.

[51] Tr. 29:5–13.

[52] Tr. 29:14–18, 31:11–25; Sackett Camera 1 at 0:09:44, 0:10:07.

[53] Sackett Camera 1 at 0:11:48; Tr. 30:2–7.

7

found your gun," to which Sackett responded, "I know it's been forever."[54] Hargrove arrived on the scene a few minutes later and Sackett told him, "The west side curse is broken," to which Hargrove responded, "Oh nice dude."[55] Hargrove also stated to another officer, "The curse is broken . . . we got a gun[.]"[56]

When he testified, Sackett explained what he meant by the phrase "west side curse":

> We had arrested . . . multiple people that were wanted for aggravated robberies. Two that were wanted for homicides and multiple people that had firearms warrants and we had yet to find a gun on any of them. And so we had a running joke saying that we were cursed, . . . we would always catch the guys who were supposed to have guns but they would never have a gun when we caught them.[57]

Nicholas provided a similar explanation and stated that the officers had not found a firearm in any calls or any traffic stops, and that the curse was broken when they found the gun.[58]

## LEGAL STANDARD

The Fourth Amendment to the United States Constitution mandates that people shall "be secure in their persons, houses, papers, and effects, against unreasonable searches."[59] When considering whether a traffic stop violates the Fourth Amendment, the court applies the "reasonable suspicion" standard as enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968).[60] This two-step analysis requires the court to consider first "'whether the officer's action was justified at its

---

[54] Sackett Camera 1 at 0:13:10; Tr. 31:16–24.

[55] Sackett Camera 1 at 0:15:22.

[56] Gov't Ex. 12, PGS_00007 (Hargrove Camera 1) at 0:06:50; see Tr. 104:24–105:11. Sackett also later states on the radio that the "curse is broken." Gov't Ex. 12, PGS_00032 (Sackett Camera 3) at 0:04:12.

[57] Tr. 30:11–25.

[58] Tr. 90:7–16. Hargrove testified similarly about what was meant by the west side curse. *See* Tr. 105:4–11.

[59] U.S. Const. amend. IV.

[60] *United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009); *see United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) (observing that traffic stop is "more analogous to an investigative detention than a custodial arrest," and therefore that such stops should be analyzed "under the principles pertaining to investigative detentions set forth in *Terry v. Ohio*").

inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'"[61]

The motion to suppress in this case implicates only the first inquiry, whether Sackett's traffic stop was justified at its inception.[62] "An investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime."[63] The Government bears the burden of "establishing by a preponderance of the evidence that reasonable suspicion supported the officer's stop of Defendant's vehicle."[64] Although the evidentiary standard for the motion to suppress is preponderance, the officer need only have a reasonable suspicion to make a stop, which falls "considerably short" of preponderance.[65] In assessing the objective reasonableness of the stop, the court must consider the totality of the circumstances.[66] Because this is an objective

---

[61] *Botero-Ospina*, 71 F.3d at 786 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

[62] ECF No. 33 at 16; ECF No. 34 at 29.

[63] *United States v. Espinosa*, 782 F.2d 888, 890 (10th Cir. 1986); *see United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir. 1990) ("[A]n investigative detention or '*Terry* stop,' is a seizure within the scope of the fourth amendment that is justified when specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime."); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.").

[64] *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) (citing *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir.2011)); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). Although the Defendant generally bears the preliminary burden of proving whether the Fourth Amendment is implicated, there is no question that the traffic stop at issue constitutes a seizure within the meaning of the Fourth Amendment. *See* ECF No. 33 at 18; *Botero-Ospina*, 71 F.3d at 786 ("A traffic stop is a seizure within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

[65] *Winder*, 557 F.3d at 1134 (stating that an officer must possess "some minimal level of objective justification" to have reasonable suspicion, quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004), and that "[e]vidence falling 'considerably short' of a preponderance satisfies this standard," quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

[66] *Cortez*, 449 U.S. at 417–18; *Winder*, 557 F.3d at 1133; *see Arvizu*, 534 U.S. at 273 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.").

9

standard, an officer's "subjective motivations in effecting a stop" are irrelevant.[67] However, the court may consider an officer's motivations in assessing their credibility.[68]

## ANALYSIS

At its heart, Defendant's motion to suppress comes down to one relatively simple question: is Sackett's testimony about the basis for the traffic stop believable? Because the court finds Sackett's testimony credible and is not persuaded by Defendant's arguments to the contrary, the motion to suppress evidence must be denied. That is, the court finds that Plaintiff has met its burden of establishing by a preponderance of the evidence that reasonable suspicion supported Sackett's traffic stop of Stott's vehicle.[69]

Following Stott and approaching South Temple northbound, Sackett observed that Stott's vehicle "merged from the number one lane into the number two lane. And as it merged, as it started its movement, it failed to signal two seconds prior to its lane change so it signaled as it started its movement."[70] Sackett was approximately fifty to one hundred feet behind Stott in the same travel lane and was close enough to see the license plate number.[71] In Sackett's understanding of the law, this was a violation of the requirement that a driver signal for two seconds prior to beginning a lane change.[72] In relevant part, Utah law requires a "signal of intention . . . to change lanes shall be given continuously for at least the last two seconds

---

[67] *Winder*, 557 F.3d at 1134 ("We have long since rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the *Terry* analysis." (citing *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008); *Botero-Ospina*, 71 F.3d at 787)).

[68] *See United States v. Wilkinson*, 633 F.3d 938, 943 (10th Cir. 2011) (observing that the district "could have considered the officers' motivations in assessing their credibility," but noting that "evidence of their motives did not compel the court to disbelieve" the officers).

[69] *See Burciaga*, 687 F.3d at 1230.

[70] Tr. 23:13–21.

[71] Tr. 19:20–20:1, 21:18–22.

[72] Tr. 16:11–17:17.

10

preceding the beginning of the movement."[73] Having observed a traffic violation, Sackett engaged his emergency lights and performed a traffic stop.[74]

Stott makes several assertions seeking to challenge the stated basis for the traffic stop. First, Stott asserts that he did not merge into lane number two until after Sackett turned on his emergency lights.[75] Second, Stott identifies several testimonial inconsistencies or other reasons that, in his view, undermine Sackett's credibility.[76] Third, he identifies possible subjective motives for the stop that he contends should discredit Sackett's statements.[77]

### 1. Stott's Dispute About the Observed Traffic Violation.

Stott testified that he did not think he broke any laws because what Sackett observed, in Stott's view, is "not what happened."[78] Specifically, Stott stated that he stayed in lane number one and did not merge until Sackett engaged his emergency lights, and only then did he turn on his blinker and merge.[79] Even if true, however, the conflicting testimony about the events preceding the stop do not undermine the basis for the stop, but merely suggest the possibility that Sackett could have been mistaken about the facts supporting it.[80]

"An officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop."[81] Sackett

---

[73] Tr. 18: 2–10; Gov't Ex. 11; *see* Utah Code Ann. § 41-6a-804(1)(b).

[74] Tr. 25:4–8, 25:21–26:13.

[75] *See* ECF No. 33 at 19–20.

[76] *See id.* at 19 ("On the other hand, the pretextual nature of this stop and officers' statements, the inconsistencies in the officers' testimonies, an officer lying to the passenger, and the failure to record the traffic violation diminish the reliability of the government's evidence.").

[77] *See* ECF No. 33 at 24–26.

[78] Tr. 124:8–19.

[79] Tr. 120:5–18, 124:8–19.

[80] To be sure, nothing in the record remotely suggests that Sackett fabricated the basis for the stop and the court credits Sackett's statement and description of events.

[81] *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004).

11

observed Stott's vehicle merge without properly signaling, immediately activated his emergency lights and body worn camera, and performed the traffic stop.[82] Within twenty seconds of making contact, Sackett explained to Stott the basis for the stop.[83] Although Stott initially argues with Sackett about the alleged traffic violation, Stott apparently was not talking about the same incident.[84] Rather, Stott thought that Sackett was referring to Stott's merging into lane number one from the median after he pulled out of the K&K African Market.[85] If Sackett was factually mistaken in his observation of an improper lane change at the intersection of South Temple, this fact was never corrected during the traffic stop. Indeed, other than Stott's testimony to the contrary, no evidence in the record contradicts Sackett's stated basis for the traffic stop. Even crediting Stott's description of events, Sackett had the reasonable suspicion necessary to justify the stop. Sackett's suspicion, if based upon a mistake of fact, was never dispelled throughout the stop by a correction of the facts.[86]

### 2. Sackett's Testimony Was Credible.

Stott also highlights several issues and alleged discrepancies in the officers' testimony that, he argues, diminish Sackett's credibility.[87]

First, Stott points out that Nicholas' description of the traffic violation does not match Sackett's.[88] A few minutes into the stop, Stott states to Nicholas, "Yeah man I didn't think like I didn't think I did anything wrong when I merged, you know, 'cause when I pulled out I was just

---

[82] *See* Tr. 23:13–18, 25:4–8, 25:21–25, 26:6–13.

[83] *See* Sackett Camera 1 at 0:01:22–1:43.

[84] *See* Tr. 123:12–124:6.

[85] Tr. 123:12–21.

[86] *See United States v. Pena-Montes*, 589 F.3d 1048, 1054 (10th Cir. 2009).

[87] *See* ECF No. 33 at 22–26.

[88] ECF No. 33 at 22–23.

12

trying to get over, but I apologize."[89] Nicholas was asked to opine on what Stott meant when he said he did not think he did anything wrong.[90] Nicholas said Stott was talking about the basis for the stop,[91] and that he "was told" by Sackett that Stott "was moving from the number two lane of travel over to the number three or turning lane of travel."[92] But Nicholas testified that he did not see the traffic infraction or the stop.[93] The court finds no basis in Nicholas' differing description of the lane numbers to discredit Sackett's observation and testimony.

Next, Stott argues that Sackett is not credible because he lied to Stott's passenger.[94] When he discovered that the passenger had a parole fugitive warrant, Sackett told the passenger that he had to take him to jail and that he had no choice.[95] In fact, Sackett later testified that he has "never let a parole violation go,"[96] that in his mind he had no choice,[97] and Nicholas testified that it was the practice of SLCPD not to let parole fugitives go.[98] The court is not persuaded that this testimony undermines Sackett's general credibility and it certainly does not undermine Sackett's description of the basis for the traffic stop.

### 3. The Officers' Subjective Motives Do Not Undermine Sackett's Credibility.

---

[89] Nicholas Camera at 0:03:57–0:04:08.

[90] Tr. 88:16–25.

[91] *Id.*

[92] Tr. 89:2–7.

[93] Tr. 80:12–14, 89:2–5, 89:16–90:6 ("It was not my stop, I didn't see the traffic infraction, so I wasn't going to try to explain why another officer had stopped him.").

[94] ECF No. 33 at 25–26.

[95] Tr. 64:5–7.

[96] Tr. 65:10–12. Nicholas also testified that it was the practice of SLCPD not to let parole fugitives go. *See* Tr. 99:24–100:8.

[97] Tr. 64:5–9.

[98] Tr. 99:24–100:8.

13

Stott also contends that several issues illustrate that the stop was motivated by reasons other than the traffic violation.[99] Stott contends that: (1) the court is "presented with some evidence that the officers involved in this case were possibly stopping all cars which left the [K&K African Market];"[100] (2) the officers were motivated to break the "west side curse;"[101] and (3) due to the position of the officers' body-worn cameras, the officers failed to preserve the objective evidence of the traffic violation.[102] The court is not persuaded that any of these undermine Sackett's credibility.

As an initial matter, the parties acknowledged at oral argument that any "subjective motives for stopping the vehicle" is irrelevant if the officer has probable cause or had reasonable articulable suspicion that a traffic or equipment violation has occurred.[103] Indeed, "the very narrow question" is "whether the initial stop of the vehicle is objectively justified."[104] Consequently, the only potential role for subjective motive in considering the motion to suppress is in assessing the officers' credibility.[105]

First, Stott contends that the officers may have been stopping all vehicles leaving the K&K African Market.[106] During the traffic stop, Hargrove stated, "Oh, it's a matter of time. We stop every car that freaking leaves [the K&K African Market], eventually we're gonna get

---

[99] ECF No. 33 at 24–25.

[100] *Id.* at 26.

[101] *Id.* at 24–26.

[102] *Id.* at 23–24.

[103] *Botero-Ospina*, 71 F.3d at 787.

[104] *Id.* at 788; *see Whren v. United States*, 517 U.S. 806, 812 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.").

[105] *See Wilkinson*, 633 F.3d at 943.

[106] ECF No. 33 at 26.

one."[107] Hargrove explained that this was a sarcastic comment and he testified that he lets go vehicles he follows when he does not observe traffic violations.[108] Consistent with the other officers' testimony, Hargrove estimated that he stopped approximately half of all vehicles he followed out of the K&K African Market.[109] In any event, Hargrove's comment does not undermine Sackett's credibility.

Second, Stott contends that the officers really wanted to break the west side curse and that the traffic violation "served as a mere pretext" to stop Stott.[110] At several points during the stop, the officers mentioned breaking the "west side curse."[111] Sackett explained, and the other officers generally confirmed, that the west side squad "had a running joke saying that we were cursed, . . . we would always catch the guys who were supposed to have guns but they would never have a gun when we caught them."[112] When they located a gun in Stott's vehicle, the curse was broken.[113] If in fact the officers were motivated to break the west side curse by finding an illicit gun, this evidence of a possible subjective motive still does not undermine the officers' testimonies in this case. Indeed, the court credits their statements regarding the circumstances surrounding the traffic stop, including Sackett's description of the observed traffic violation.

---

[107] Hargrove Camera 1 at 0:00:54.

[108] Tr. 106:11–14, 106:22–25.

[109] Tr. 106:15–21; *see* Tr. 18:21–19:2; Tr. 86:2–10.

[110] ECF No. 33 at 24–26.

[111] *See, e.g.*, Sackett Camera 1 at 0:11:48, 13:10, 15:25; Sackett Camera 3 at 0:04:12; Hargrove Camera 1 at 0:06:50; Tr. 29:19–30:25 (Sackett); Tr. 90:7–16 (Nicholas); Tr. 104:21–105:11 (Hargrove).

[112] Tr. 30:11–25.

[113] Tr. 29:19–30:25, 90:13–16, 105:5–11.

Third, Stott argues that the lack of video evidence of the traffic violation is "inexcusable" for a squad "rely[ing] on traffic infractions to make arrests."[114] Sackett, who followed Stott and observed the traffic violation, had a body worn camera on his chest and no vehicle dash cam.[115] As a result of the body worn camera positioning, it did not capture video of Stott's traffic violation.[116] Sackett testified that positioning the camera on his shoulder could capture video of observed traffic violations, but that it could come off or fall to the side from that position.[117] Nicholas stated that he could not move his chest-mounted camera to his shoulder or place it on the dashboard of his patrol vehicle while driving.[118] Based on the testimony received by the court, these are acceptable reasons for the officers to select chest-mounted cameras over other potentially less-secure options. The court finds no basis to question whether Sackett was truthful in his statement about the observed traffic violation because of his camera mount selection.

In sum, Plaintiff has provided sufficient evidence to establish by a preponderance that Sackett's traffic stop of Stott was lawful at its inception. That is, Sackett observed an improper lane change, had reasonable articulable suspicion if not probable cause to investigate the illegal conduct, activated his emergency lights, and effected the traffic stop on this basis. Almost immediately, Sackett told Stott the reason for the stop and Sackett testified consistent with his observation. Stott's challenges to Sackett's credibility are unpersuasive, even crediting his

---

[114] ECF No. 33 at 23. In his motion, Stott expresses concern over the "failure to preserve the objective evidence" of the traffic violations. ECF No. 33 at 23. However, there is no dispute that the traffic violation forming the basis for the stop was not captured on video and therefore there is no video evidence to preserve.

[115] Tr. 44:18–19, 66:19–21.

[116] *See* ECF No. 34 at 38.

[117] Tr. 43:4–44:3.

[118] Tr. 93:20–94:9.

differing perception of what transpired. Accordingly, the court must deny the motion to suppress evidence.

## ORDER

For the reasons stated in this Memorandum Decision and Order, Defendant's Motion to Suppress Evidence is DENIED.[119]

Signed July 9, 2021.

BY THE COURT

David Barlow
United States District Judge

---

[119] ECF No. 23.